IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HOLLY M. W.[1] ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil No. 3:19-cv-762-GCS[2] |
| ) | |
| COMMISSIONER of SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

### PROCEDURAL HISTORY

Plaintiff applied for DIB in April 2015, alleging a disability onset date of April 15, 2015. After holding an evidentiary hearing, an Administrative Law Judge ("ALJ") denied the application on June 25, 2018. (Tr. 17-28). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 1). Plaintiff exhausted administrative remedies and filed a

---

[1]   Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

[2]   This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c).  *See* (Doc. 11, 20).

timely complaint with this Court.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

1. The ALJ ignored medical evidence that undermined his conclusion.

2. The ALJ erred in weighing the medical opinions.

3. The ALJ erred in evaluating Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms.

## APPLICABLE LEGAL STANDARDS

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) is the claimant presently unemployed?; (2) does the claimant have a severe impairment?; (3) does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations?; (4) is the claimant unable to perform her former occupation?; and (5) is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant

is disabled.  A negative answer at any step, other than at step 3, precludes a finding of disability.  The claimant bears the burden of proof at steps 1–4.  Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy.  *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).  While judicial review is deferential, it is not abject as the Court does not act as a rubber stamp for the Commissioner.  *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above.  He

determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. She was insured for DIB through September 30, 2019. Plaintiff was 29 years old on the alleged date of disability and was about to turn 33 years old on the date of the ALJ's decision.

The ALJ found that Plaintiff had the following severe impairments: lumbar degenerative disc disease with stenosis and radiculopathy for which she had two surgeries; post-laminectomy syndrome; fibromyalgia; and Hashimoto's thyroiditis. The ALJ also found that Plaintiff had the Residual Functional Capacity ("RFC") to do light work with some physical limitations. The ALJ further found that Plaintiff was not able to do her past relevant work as a restaurant cook, cleaner, or cashier. He found that her physical limitations did not significantly erode the sedentary or light occupational base, and Plaintiff was not disabled because she was able to do a full range of sedentary work.

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### 1. Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing in February 2018. (Tr. 37). Plaintiff lived with her fiancé and her seven-year-old daughter. Her daughter has cystic fibrosis. (Tr. 45). Plaintiff's last job was as a cashier at a Rural King store. She quit to have back surgery and did not try to go back to work. (Tr. 48).

Plaintiff testified that she could not work because she spent "a lot of the time reclining and laying down because of the pain and fatigue in [her] back." She had back surgeries in 2015 and 2017. She said that the second surgery did not make any difference and she felt the same. The only household chore she did was washing dishes. She had to take frequent breaks. (Tr. 50-52). After being on her feet for fifteen minutes, she had to lay down because of low back pain. (Tr. 63). Plaintiff used medical marijuana for her back pain and as a muscle relaxer. Her prior pain medications were stopped because they did not work anymore. (Tr. 65).

**2.     Relevant Medical Records**

At a visit with primary care provider Dr. Hope Knauer in February 2015, Plaintiff complained that she had back pain radiating down both legs for some time. Dr. Knauer had been prescribing Hydromorphone (Dilaudid) for pain. She ordered an MRI. (Tr. 519-521). The radiology report stated there was no interval change at the L4-5 level when compared to an MRI done in 2014. The 2014 study had shown a small central disc protrusion abutting the L5 nerve roots bilaterally, but the clinical significance was indeterminate. In addition, the 2015 MRI showed a small midline disc herniation causing indentation of the thecal sac and moderate central canal stenosis. The MRI further showed mild impingement due to the presence of lateral recess stenosis and a disc bulge abutting the LS nerve roots, in addition to mild bilateral foraminal stenosis. (Tr. 278).

In May 2015, Dr. Teal, a neurosurgeon, performed a bilateral laminotomy and foraminotomy at L3-L4 and L4-L5 by microdissection. (Tr 341). At a post-op visit two

weeks later, Plaintiff was walking without an assistive device. Her gait was a little slow with a little guarding of her back. Because she lifted a lot of heavy packages at her job at Rural King, she was kept off work. She was to start physical therapy ("PT"). (Tr. 378).

Dr. Teal saw Plaintiff on July 2, 2015. She complained of persistent back and left leg pain. Her incision was well healed, and she had a full range of motion of her back. Sensory exam showed only decreased sensation to a pinprick in the left foot. A motor examination, which included muscle strength, was normal. Her gait was normal as well. Dr. Teal's assessment was "[p]atient with residual back and leg pain after lumbar decompression surgery." He said she should not lift over thirty pounds and should not do repetitive bending, twisting, running, or jumping. She was to continue PT and follow up in one month. (Tr. 377). When she returned in late August, Plaintiff still had back and leg pain. Dr. Teal concluded she had not benefitted from lumbar decompression. He recommended a non-impact exercise regimen like walking, swimming, or riding a stationary bike three to five times a week. She was ordered to stop PT and to try Lyrica through her primary care provider. She was also ordered to see Dr. Ghalambor for epidural steroid injections and to get a repeat MRI. He said she could return to "light medium work with no lifting > 30 lbs, twisting, or jarring." (Tr. 394-395).

In September 2015, an MRI showed postsurgical changes at L3-4 and L4-5 with prominent scar tissue surrounding the dural sac and posterior aspect of the central canal. There were also degenerative changes at L3-4 and L4-5. (Tr. 396-397).

Later that same month, Dr. Knauer filled out a form at the request of Plaintiff's attorney. The doctor had not seen Plaintiff since June 2015. The form asked her to assume that Plaintiff was limited to sedentary work. The doctor listed objective findings of mild L-S tenderness, no weakness, normal deep tendon reflexes, and positive straight leg raising on the left. Dr. Knauer checked blanks to indicate Plaintiff's impairments would cause pain and that she would need extra breaks during the workday and would miss work about twice a month. She left the section for "Explanation/Remarks" blank. (Tr. 399-401). About six days later, Dr. Knauer saw Plaintiff for a well-woman visit. Dr. Knauer noted that Plaintiff indicated she "fe[lt] well with minor complaints." No complaints of back pain were noted. An examination of the lumbosacral spine showed no tenderness to palpation or pain, and a sensory exam was normal. The assessment was "[h]ealthy adult." (Tr. 505-508).

Dr. Ghalambor administered injections in October and November 2015. (Tr. 761-763, 767).

Dr. Ruth Craddock, a rheumatologist, evaluated Plaintiff for fibromyalgia in November 2015. Plaintiff said she had two car accidents in 2005 and had "chronic constant pain" since then. Dr. Craddock noted there was "open litigation" for both accidents. Dr. Craddock's assessment was fibromyalgia by history and exam. (Tr. 415-416).

In December 2015, Dr. Vittal Chapa performed a consultative exam at the request of the agency. Plaintiff had 4+ strength in both legs and a full range of motion of all joints. She showed "slight weakness" of the dorsiflexors of the left ankle. Her gait was

normal. She showed "subjective" lower back flexion of 30 degrees. (Tr. 407-411).

Plaintiff's next treatment was a visit with Dr. Knauer in March 2016 where she complained of fatigue and she thought her thyroid was "out of whack." A musculoskeletal exam was conducted and the results were normal. (Tr. 489-491).

Plaintiff saw pain management specialist Dr. Fancher once in June 2016. She complained of both neck and low back pain. He diagnosed failed back surgical syndrome in the lumbar spine. He said that, if injections did not help, he would not be able to treat her back problems because, in part, she could not have a spinal cord stimulator for unspecified reasons. (Tr. 757-758).

During other medical appointments throughout the rest of the summer of 2016, Plaintiff made no complaints of back pain. The doctors also recorded no findings indicating low back pain. (Tr. Tr. 566-567, 478, 561-562).

Plaintiff saw Dr. Knauer in September 2016, complaining of "a lot of back pain." After conducting a musculoskeletal exam, Dr. Knauer noted only that gait and station were normal. (Tr. 474-476). A week later, an MRI showed stable postoperative changes as compared to a 2015 MRI, which showed degenerative changes and a disc herniation at L4-5. (Tr. 471-472).

Plaintiff saw Dr. Teal in October 2016.[3] He noted decreased sensation to pinprick in the left calf, mild left foot weakness and positive straight leg raising on the left. He reviewed the MRI from the previous month. His assessment was failed back surgery syndrome. He made several recommendations including physical therapy and an

---

[3] Plaintiff's brief incorrectly states that Plaintiff did *not* see Dr. Teal after Dr. Knauer referred her back to him in September 2016. *See* (Doc. 19, p. 9).

evaluation for a spinal cord stimulator. (Tr. 805-806). Plaintiff did not follow these recommendations and did not return to Dr. Teal.

In November 2016, Dr. Knauer notified Plaintiff that she was terminating their physician-patient relationship because of "inconsistencies [with] regard[] to [Plaintiff's] health history" which made the doctor uncomfortable. (Tr. 460).

The next medical treatment was in April 2017 when Plaintiff first saw Dr. Islam as her new primary care provider. She complained of several problems including insomnia and lower back pain.[4] On exam, she had no tenderness to palpation of the lumbar spine, negative straight leg raising, full strength, and intact sensation. Dr. Islam changed her pain medication from Dilaudid to morphine sulfate. (Tr. 658-661). Later that same month, Plaintiff reported that her medications were working well. Dr. Islam discussed the goal of weaning her off opioids. She had been referred to a medical cannabis facility. An exam showed lumbar tenderness on palpation. She was referred to a neurosurgeon for a second opinion regarding a lumbar fusion. (Tr. 654-657).

Plaintiff saw Dr. Parks, a pain management specialist, seven times between April and June 2017 for injections and diagnostic medial branch blocks. (Tr. 523-532, 694-708).

Plaintiff saw Dr. Rahman, a neurosurgeon, in August 2017. He reviewed an MRI which showed degenerative disc disease at L4-5 with moderate canal stenosis. He recommended a fusion and a decompressive laminectomy at L4-5. (Tr. 792-794). Dr. Rahman performed this surgery on September 6, 2017. (Tr. 815-816).

---

[4] Defendant's brief incorrectly states that Plaintiff did not complain of back pain at this visit. *See* (Doc. 27, p. 7). She did. (Tr. 659).

Two weeks after surgery, Plaintiff told Dr. Rahman that her pain had improved but she still had constant low back pain that radiated up her back between her shoulder blades. An exam showed a well-healed surgical incision and no gross motor or sensory deficits in her lower extremities. X-rays showed "perfect placement of instrumentation and alignment." Dr. Rahman wrote that she was "doing very well" and she was "very happy with the surgical outcome." (Tr. 795-797).

The last medical record is from a visit with Dr. Rahman in November 2017. An exam showed no gross motor deficits in the lower extremities. Plaintiff reported numbness along the left L5 distribution. Otherwise, sensation in the lower extremities was intact. Her incision was well-healed with no sign of infection. She was nontender along the SI joints. She was able to go from a seated to a standing position with appropriate balance, and her gait was steady. A lumbar CT showed excellent bone fusion with stable positioning of the instrumentation. The doctor noted that she continued to have some left sided low back pain with standing or sitting and some residual left leg numbness for which he recommended PT. She did not require a lumbar brace and could return to her regular activities as tolerated. Dr. Rahman wrote that she was "doing very well" and she was "very happy with the surgical outcome." (Tr. 786-791).

In December 2017, Dr. Islam completed the same type of form that had earlier been completed by Dr. Knauer. The doctor said he had seen Plaintiff in November 2017, but there is no record of that visit in the transcript. The doctor listed objective findings of bilateral S-1 radiculopathy. Dr. Islam checked blanks to indicate Plaintiff's

Page **10** of **18**

impairments would cause pain and fatigue and she would need extra breaks during the workday. She would miss work more than three times a month. He left the section for "Explanation/Remarks" blank. (Tr. 808-810).

Plaintiff's lawyer furnished Dr. Rahman with a document listing Plaintiff's subjective complaints. The form asked whether the doctor thought her subjective complaints were credible. He checked the blank for "yes." (Tr. 812).

### 3. State Agency Consultants' Opinions

In June 2015 and February 2016, two state agency consultants assessed Plaintiff's RFC based on a review of the record. Both concluded that Plaintiff could do light work with some physical limitations. (Tr. 75-77, 86-88).

## ANALYSIS

For her first point, Plaintiff presents a laundry list of medical evidence not mentioned by the ALJ, beginning with medical treatment that occurred months before she claims she became disabled. An ALJ is of course not required to address every piece of evidence in the record. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). At the same time, the ALJ cannot highlight only the evidence that supports his conclusion while ignoring contrary evidence that supports Plaintiff's application. *See Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014). Rather, he must consider all relevant evidence in the case record and evaluate the record fairly. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3).

Plaintiff here seems to have pulled from the record almost every bit of medical

evidence that was not mentioned by the ALJ, but she fails to demonstrate that the failure to mention the evidence undermines the ALJ's conclusion.

For example, the failure to mention the medical evidence before the alleged date of onset has no significance in the circumstances of this case.   Plaintiff had back surgery shortly after her alleged date of onset.   Consideration of the conservative treatment she underwent prior to her surgery would not likely change the outcome of the case.

Plaintiff also points to a number of visits between her surgeries that were not mentioned by the ALJ.   However, the ALJ set out a fairly comprehensive summary of her course of treatment at Tr. 22-24.   She asserts that he did not mention Dr. Fancher's diagnosis of failed back syndrome.   However, the ALJ included post-laminectomy syndrome among her severe impairments, which is another name for failed back surgery syndrome.   *See Plessinger v. Berryhill*, 900 F.3d 909, 911 (7th Cir. 2018).

Plaintiff further argues that the ALJ did not mention all of the findings on the September 2015 MRI, but the ALJ did mention Dr. Teal's comments about that study at Tr. 23.   The neurosurgeon's comments are more relevant than an unexplained recitation of every technical finding in the radiology report.   And, because Plaintiff had a second lumbar surgery, consideration of the details of the visits the ALJ did not mention would not likely change the ALJ's conclusion.

Plaintiff's most serious claim of error under her first point is that the ALJ failed to mention "Dr. Craddock's opinion that Wright demonstrated behaviors indicative of a personality disorder during her exam."   Plaintiff argues that the ALJ erred in finding that these behaviors lessened the reliability of her statements about her symptoms

"without acknowledging Dr. Craddock was of the opinion they were rooted in a mental health problem, as opposed to any intention of Wright to be deceitful."  (Doc. 19, p. 18). The problem with this argument is that Dr. Craddock expressed no such opinion.

Dr. Craddock is the rheumatologist who evaluated Plaintiff for fibromyalgia in November 2015.  The physical exam notes included observations that Plaintiff's "reaction to palpation was very exaggerated." The exam notes also indicated that during the lumbar spine exam "[Plaintiff] fights me lifting her leg" and "fights efforts to lift arms."  She noted that Plaintiff interrupted her and rejected her treatment recommendations.  Dr. Craddock suggested weaning her off narcotics "as they clearly do not help – pt is writhing under minimal touch on exam, tearful in describing her pain, despite more Dilaudid than most large men would take." The doctor also suggested a psychiatric exam as "pt appears to have unresolved issues or perhaps a personality disorder, given her surly nature and answers to basic and straightforward questions at consult today."   (Tr. 415-416).

Contrary to Plaintiff's suggestion, Dr. Craddock did not express the opinion that her exaggerated pain behaviors were rooted in a mental health problem.  The doctor drew no connection between her pain behaviors and the need for a psychiatric exam. Rather, she supported her suggestion for a psychiatric exam by citing Plaintiff's surliness and answers to the doctor's questions.  Ironically, Plaintiff argues that "[a]n ALJ's decision is not supported by substantial evidence when the ALJ improperly played doctor by incorrectly interpreting medical evidence."  (Doc. 19, p. 18).  However, "playing doctor" is exactly what Plaintiff is arguing the ALJ should have done here since

Page **13** of **18**

Dr. Craddock did not connect Plaintiff's pain behaviors with a possible personality disorder. Further, Plaintiff never took the position before the agency that she had a personality disorder or any other mental impairment.

Plaintiff's second point concerns the ALJ's weighing of the medical opinions. However, the ALJ was not required to fully credit the opinions of Plaintiff's treating physicians because of that status. "While the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (internal citation omitted). A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *See Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)(citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)).[5]

If the ALJ decides not to give the opinion controlling weight, he is to weigh it applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques [,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

Plaintiff argues that the ALJ should have given more weight to the opinions of Dr. Knauer and Dr. Islam, her primary care providers. Their opinions have already been described above. At Tr. 25, the ALJ noted that both opinions were offered by

---

[5] Plaintiff's application was filed before March 27, 2017. The so-called treating source rule therefore applies. *See* 20 C.F.R. § 404.1527(c)(2).

completing a form that asked the doctors to assume that Plaintiff was capable of only sedentary work. The ALJ said that he gave little weight to both these opinions because they were inconsistent with the doctors' own observations as neither doctor documented significant positive findings on examination of the Plaintiff's back. In addition, Dr. Knauer's opinion conflicted with Dr. Teal's opinion, and Dr. Islam's opinion conflicted with Dr. Teal's opinion and Dr. Rahman's treatment records. The ALJ properly found that the opinions of the surgeon outweighed the opinions of the non-specialist primary care physicians. Further, the ALJ noted that Dr. Islam saw Plaintiff only a handful of times.

In contrast, the ALJ gave great weight to Dr. Teal's opinion that Plaintiff could return to work if she did not lift over thirty pounds and avoided twisting or jarring. The ALJ noted that this was months after Plaintiff's first surgery. Dr. Teal further expressed this opinion after acknowledging that Plaintiff continued to have pain and had not benefitted from surgery. (Tr. 26). Plaintiff's argument that Dr. Teal's opinion was unacceptable because he referred to light and medium work is incorrect; Dr. Teal gave a specific weight limitation and movements to be avoided.

Considering the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ easily met the minimal articulation standard here. The reasons he gave for the weight he assigned to the opinions were supported by the record and took into consideration the required

regulatory factors.

Plaintiff additionally argues that the ALJ failed to consider Dr. Rahman's opinion. This argument, however, is borderline frivolous. Dr. Rahman was asked only to opine on whether Plaintiff's subjective complaints were credible. This does not rise to the level of a medical opinion that must be considered by the ALJ. The regulations define "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §404.1527(a)(1).

For her last argument under this point, Plaintiff takes issue with the weight given to the opinions of the state agency consultants, largely because they did not review all of the medical evidence. Her argument, however, ignores the ALJ's conclusion that the opinions were consistent with Dr. Teal's opinion and the rest of the objective evidence. (Tr. 26).

It is worth noting that the determination of RFC is an administrative finding that is reserved to the Commissioner. *See* 20 C.F.R. §404.1527(d)(2). The ALJ was not required to adopt any of the medical opinions. The ALJ "must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions . . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).

Lastly, Plaintiff argues that the ALJ erred in evaluating her statements concerning the intensity, persistence, and limiting effects of her symptoms. She, however, presents only a summary argument that requires little analysis.

Plaintiff takes issue with the ALJ's statement that her allegations were "not entirely consistent" with the other evidence in the record. According to Plaintiff, the "entirely consistent" language indicates that the ALJ applied an incorrect standard. This argument is also borderline frivolous. The language is, as Plaintiff asserts, boilerplate language that appears in many ALJ decisions. However, the use of boilerplate language is harmless where the ALJ goes on to give his reasons for his decision. *See Burmester*, 920 F.3d at 510. The use of the phrase "not entirely consistent" does not suggest that the ALJ used an incorrect standard. The ALJ cited the correct standard at Tr. 21 and discussed the relevant factors in assessing Plaintiff's allegations.

Other than that, Plaintiff simply asserts that the ALJ's consideration was "laden with factual error or omission of facts" as set forth under her first point. (Doc. 19, p. 27). This argument fails for the reasons already explained. Notably, as the ALJ pointed out at Tr. 24, Plaintiff testified that she was in so much pain that she had to spend most of the day reclining, but no healthcare provider ever recorded a complaint of such severe limitations.

At its core, Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. She has not identified any error requiring remand. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence. The ALJ's decision was supported by such evidence, and thus the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *See Burmester*, 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## CONCLUSION

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:   July 15, 2020.**

Digitally signed by Judge Sison
Date: 2020.07.15 14:04:18 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**